655 So.2d 380 (1995)
Ralph KAMPEN
v.
CONWAY SOUTHWEST EXPRESS.
No. 95-CA-45.
Court of Appeal of Louisiana, Fifth Circuit.
April 12, 1995.
*381 B. Gerald Weeks, New Orleans, for plaintiff/appellant, Ralph Kampen.
Dale W. Poindexter, Ruston, for defendant/appellee, Conway Southwest Exp.
Before BOWES, GAUDIN and GOTHARD, JJ.
*382 BOWES, Judge.
The plaintiff, Ralph Kampen, appeals from a judgment denying reinstatement of his worker compensation benefits. We affirm.

FACTS
On September 5, 1992, at about 7:00 a.m., plaintiff was involved in a one-vehicle accident in Tangipahoa Parish, Louisiana. Kampen was driving a tractor-trailer truck when he lost control of the rear trailer, causing the rig to go off the road. The truck landed on its side, facing the wrong way, when it came to rest. Kampen testified at trial that when the accident happened, he hit his head on the left side of the door post and he was thrown under the dashboard and "knocked around" the cab of the vehicle. Kampen did not receive medical treatment at the scene of the accident, however, he did seek medical treatment at Lallie Kemp Hospital in Independence, Louisiana, later that same day. Kampen testified that he received treatment for his knee, which was swollen. The emergency room personnel also cleaned his scrapes and bruises, and performed x-rays. There is no mention of any head trauma in the emergency room treatment report.
Kampen testified that a few days after the accident, he sought treatment with Dr. John Cazale, an orthopaedist. In addition to his knee injury, he was experiencing pain in his neck and back.
Kampen also testified that within a week of the accident he experienced his first seizure and that he has had several more since that time. Dr. Cazale referred him to Dr. Roy Fleming, a neurologist. Dr. Fleming prescribed Dilantin to control the seizures, however, at the time of trial he was not seeing Dr. Fleming or taking the Dilantin because worker's compensation would no longer pay for the appointments or prescriptions.
At trial, it was stipulated that Kampen was employed by Conway South Express and that he was in the course and scope of his employment at the time of the accident on September 5, 1992. Compensation was paid through January 14, 1994 at the rate of $286.52 per week.
Kampen testified that, as a result of the accident and the resultant seizures, he can no longer work as a commercial driver. Furthermore, because of pain in his neck and back, he cannot work in that he cannot load and unload the trucks, he cannot go places because he aches all the time and because he is afraid. He can no longer do what he used to do and earn what he earned as a truck driver. This has caused him to become severely depressed. In September of 1993, one year post-accident, both Dr. Cazale and Kampen's attorney sent him to consult with Dr. Oliver Sanders, a psychiatrist. At trial, Kampen testified that Sanders had set up a regime of treatment to begin after the trial for his depression.
Evidence was adduced to show that plaintiff was forty-five years old at the time of trial. He had been in the military for eleven months; five and one-half of those months involved active duty in Vietnam. While in the Army, he obtained the skills necessary to be a commercial truck driver. Prior to the accident, he was employed by Conway. His duties involved driving the trucks, and loading and unloading cargo. He had no difficulty in performing these duties.
During the trial, Kampen testified that he had never hurt his back, shoulders or neck prior to the accident. Kampen also testified that he had never been treated for any epilepsy or any kind of seizure disorder as a child or as an adult and he had never been diagnosed or treated for any psychiatric problems.
During the cross-examination of Mr. Kampen, defendants introduced hospital records to show that he had been treated on five different occasions, from 1986 to 1990, for various injuries to his shoulders, neck and back. The defendants also introduced medical records of Baptist Hospital, which reflected that Kampen had been admitted to the hospital when he was ten years old after experiencing a seizure, possibly as a result of an allergic reaction to penicillin. In addition, the defendants introduced the medical records of the Veterans Administration Hospital, which showed that Kampen was having seizures and psychiatric problems, including violent episodes of behavior, in 1974. Kampen *383 denied that he was treated for epilepsy/seizures or for any psychiatric disorder while at the Veterans Administration Hospital. However, he stated that he was treated for adjustment problems after his return from Vietnam. Kampen admitted that, as a child, he had been hospitalized for ten months at Southeastern Louisiana Hospital which he was told was for psychiatric treatment. However, he said his parents sent him to Southeastern because they did not want him around anymore and boarding school was too expensive.
Subsequent to the accident, plaintiff was underneath a car when the jacks holding the car up failed and the car fell on him causing him to sustain fractures of both clavicles (collar bones).
Plaintiff's wife, Katherine Kampen, testified that she met Kampen in May of 1971, that they were married in March of 1972 and that Kampen had never been diagnosed or treated for any epileptic or seizure disorder. She said she remembered talking to the doctors at the Veterans Administration Hospital and at that time Kampen was showing signs of stress because they had just had a baby and he was having difficulty adjusting to civilian life.
All other testimony in this matter was submitted via deposition.
In his deposition, Dr. Cazale testified that he first saw Kampen on September 14, 1992. At that time, Kampen gave a history of the accident and related that he was experiencing pain in his right ankle, left knee and back. Kampen denied any prior injury to his back and neck. Dr. Cazale diagnosed multiple contusions and abrasions, along with contusions of the left ankle, and lumbar strain, and requested that a bone scan and CAT scan be performed.
Dr. Cazale next saw Kampen on September 22, 1992. The results of the bone scan were normal, however the CAT scan reflected that Kampen suffered from a pre-existing significant degenerative disc disease of the lumbar spine, which could have been aggravated by the accident. Dr. Cazale testified that, at this time, Kampen was disabled and could not work.
Dr. Cazale saw Kampen approximately seven more times over the course of the next year. Cazale opined that Kampen suffered soft tissue injury to his back and his knee which had resolved over the year. It was Cazale's opinion that the accident caused an aggravation of his pre-existing degenerative disc disease, which resolved itself over time, placing Kampen in the same physical condition as before the accident. He also said that Kampen should not return to truck driving because of the effect of the vibration on his pre-existing degenerative disc disease. Dr. Cazale also stated that Kampen never told him about any prior back or neck injuries and did not mention any seizures after 1970.
Dr. Roy Fleming, and expert in neurology, testified that he first saw Kampen on September 17, 1992, twelve days after the accident. Kampen related to Dr. Fleming that he had been in a truck accident and that he was flipped inside the truck and knocked unconscious. When he regained consciousness, he was in a dazed state with a large lump on his left temple. He was evaluated by a local hospital and then sent home. Kampen further related that the next night, he had a generalized seizure. He had three other seizures before beginning treatment with Dr. Fleming, the last on September 16th, the day before his visit.
Kampen also complained of headaches, blurred vision, double vision, "passing out and near passing out spells" and various neck and back pains. Dr. Fleming examined Kampen and found no physical evidence of head trauma, and the results of the neurological examination were within the normal range. Dr. Fleming also prescribed Dilantin to control Kampen's seizures.
Dr. Fleming next saw Kampen on October 27, 1992. He again performed a neurological examination, which was normal. The plaintiff underwent several tests, namely an EEG, an EMG, a CAT scan, and a nerve conduction study, all of which had normal results. Dr. Fleming noted that there were no objective findings of injury and no cognitive defect, but diagnosed general seizures, most likely post-traumatic or post-concussive in nature.
*384 Plaintiff was next seen on November 24, 1992 at which time he reported pain in his neck and back, but no seizures. Plaintiff returned on December 21, 1992 stating that he had a seizure the night before and then returned again on January 29, 1993. Prior to this appointment, plaintiff underwent a 24 hour EEG examination with normal results and Dr. Fleming again performed a neurological examination which was normal.
In his deposition, Dr. Fleming testified he never discovered any objective findings of injury. It was his opinion that the accident was the cause of Kampen's seizure disorder, based upon the medical history related to him by Kampen. He further testified that, if Kampen had a prior seizure disorder, the accident could have had some effect on the disorder and he also stated that a head injury can bring on a latent idiopathic seizure disorder that was present previously. Dr. Fleming further stated that, from a neurological standpoint, there is nothing to disable Kampen from performing any kind of work, with the restriction that he not drive and that he not work around heavy machinery because of the danger of seizures.
Gloria Breaux, a social worker employed by psychiatrist Dr. Walter Sanders, gathered a social history from Kampen for Dr. Sanders. She interviewed Kampen on September 24, 1993. At that time, he told her that he had been on several medications for two years, including Dilantin, an anti-inflammatory drug (often used for treatment of seizures), Actifed, Extra Strength Tylenol and Soma. He then related that he had struck his head in the accident and has experienced seizures since that time. He also stated that he had been to an Outreach Clinic some three or four years previously to help him find employment and to help him cope with his life. He also stated that since the accident he was quick to anger, irritable and severely depressed.
Dr. Walter Sanders, an expert in psychiatry, testified via deposition that he first saw Kampen on September 28, 1993 and again on January 12, 1994. Kampen was aware that, because of the seizures, he could not renew his commercial driver's license. Dr. Sanders performed some tests and diagnosed severe anxiety and severe to extreme depression, caused by a variety of factors, including inability to work and chronic pain. Dr. Sanders stated that, in his opinion, the accident caused epilepsy, which caused the depression. However, Dr. Sanders stated that his diagnosis was based on the history given by plaintiff, and that his opinion might change if he discovered that plaintiff had had epilepsy prior to the accident.
Dr. Michael Howard is an expert in neuropsychology. He examined Mr. Kampen at the request of the employer on May 18 and June 7, 1993. Kampen complained of pain in his knees, ankles, back and neck and constant headaches. Kampen also complained of depression and being overweight, difficulty with sleeping, irritability and general body weakness. Kampen did not complain of any cognitive problems. Kampen did not tell Howard of any previous back or neck injuries and he did not mention any seizure disorder prior to the September 5, 1992 accident. Kampen did mention several pre-injury stresses, including combat, marital difficulties, financial problems, sexual problems, loss of friends, legal difficulties and conflicts with other people. Dr. Howard performed a battery of tests and diagnosed a mild to moderate emotional disability from major depression and possible chronic pain syndrome, the onset of which appeared to be secondary to his physical injuries caused by the September 5, 1992 accident. In his report, Dr. Howard stated that the results of the tests scored did not show a pattern indicative of recently acquired mild traumatic brain dysfunction. Kampen has no consistent cognitive deficits which would create a difficulty in competitive employment or independent living; he has, at the least, the capacity to work competitively in some type of sedentary job; however if he remained at his current level of depression, his chances of returning to competitive employment are less than 50-50.
Dr. Robert Kenney specializes in family practice. He first saw Kampen in October of 1990 for an unrelated sinus condition and hypertension. At that time, plaintiff indicated that he had chronic back pain (as a part of his medical history) however, he was not treated for this condition at that time. Plaintiff *385 returned to Dr. Kenney in August of 1993, at which time he stated that he had again restarted treatment for epilepsy in November of 1992. When Dr. Kenney questioned Kampen, he became angry and left, and he has not returned to Dr. Kenney since that time. There is also a notation on Kampen's medical record that he suffered from epilepsy from 1960 to 1970, however, Dr. Kenney could not say whether that notation was made in October of 1990 or in August of 1993. Dr. Kenney stated in his deposition that he requested Kampen's medical records from the Veterans Administration when he first treated him in 1990.
The Veteran Administration medical records reflect that Dilantin was prescribed for Kampen on December 5, 1973 and May 6, 1974. On June 19, 1974, Kampen was diagnosed as having a paranoid personality with intermittent psychosis and possible seizure disorder.

ANALYSIS
Plaintiff originally filed his claim to require defendant to pay for medical treatment and related expenses. Subsequent to the filing of the claim, his benefit payments were terminated. Plaintiff also claims that he is still disabled as a result of the September 5, 1991 accident and that his benefits were wrongfully terminated.
In his first assignment of error, plaintiff alleges that the trial court erred in failing to find that he was disabled and entitled to benefits because Dr. Fleming, Dr. Sanders and Dr. Howard all testified without contradiction that he was disabled. In conjunction with this allegation, plaintiff alleges in his second assignment of error that the trial court erred in admitting into evidence certain medical records and in relying on these records in his ruling.
As in other civil cases, the plaintiff in a worker's compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992). The plaintiff also must establish a casual link between the accident and the subsequent disabling condition. Peveto v. WHC Contractors, 630 So.2d 689 (La. 1994).
In a worker's compensation case, as in other cases, we are bound by the manifest error rule and we may not set aside the trial court's findings of fact unless they are clearly wrong or manifestly erroneous. Smith v. Louisiana Dept. of Corrections, 93-1305 (La. 2/28/94), 633 So.2d 129. Even though an appellate court may feel its own evaluations and inferences are more reasonable than those of the factfinder, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Smith, supra.; Rosell v. ESCO, 549 So.2d 840 (La.1989).
In this case, the trial court (hearing officer) found that Mr. Kampen's orthopaedic injuries, caused by the accident, had been resolved prior to the termination of employer benefits. The trial court also found that Mr. Kampen's disabling conditions, namely the epileptic and/or seizure disorder and the depression, were not caused by the accident, but were conditions which predated the accident. Based on the record before us, we cannot say that the trial court was manifestly erroneous in these factual findings.
Plaintiff also alleges that the trial judge erred in considering the medical records of Baptist Hospital and the Veteran's Administration in reaching his decision. Plaintiff asserts that these records, which were offered for impeachment purposes, constitute a "type of insinuation that there has been pre-existing epilepsy [which] does not rise to the level of proof, required as an affirmative defense needed by the defendant."
R.S. 23:1317A provides:
If an answer has been filed within the delays allowed by law or granted by the hearing officer, or if no judgment has been entered as provided in R.S. 23:1316 at the time for hearing or any adjournment thereof, the hearing officer shall hear the evidence that may be presented by each party. Each party shall have the right to be present at any hearing or to appear through an attorney. The hearing officer shall not be bound by technical rules of *386 evidence or procedure other than as herein provided, but all findings of fact must be based upon competent evidence and all compensation payments provided for in this Chapter shall mean and be defined to be for only such injuries as are proven by competent evidence, or for which there are or have been objective conditions or symptoms proven, not within the physical or mental control of the injured employee himself. The hearing officer shall decide the merits of the controversy as equitably, summarily, and simply as may be.
At the hearing on this matter, Mr. Kampen specifically denied ever having had any epilepsy or any seizures prior to the accident and he specifically denied ever receiving any psychiatric treatment prior to the accident. Defendants therefore were allowed to introduce these records to impeach plaintiff with regard to these statements. C.E. 607(D)(2) and C.E. art. 613.
We, therefore, conclude that the first two assignments of error alleged by plaintiff lack merit.
In his third assignment of error, Mr. Kampen alleges that the trial court erred in finding that he had waived his right to any supplemental earning benefits.
La.R.S. 23:1208 provides in relevant part that:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
* * * * * *
E. Any employee violating this Section shall, upon determination by hearing officer, forfeit any right to compensation benefits under this Chapter.
During the entire proceeding of this matter, including the taking of plaintiff's testimony under oath, he not only failed to disclose that he had been treated in the past for seizures, but he also denied ever having received such treatment. Kampen expressly denied having sustained prior back, neck and/or shoulder injuries. However, evidence was presented to show that he had sought treatment on four or five previous occasions for injuries to these areas. Kampen specifically denied having psychiatric treatment, but later testified that he had had prolonged periods of depression in the 1970's as did other Vietnam veterans.
After consideration of the record, the trial court concluded that "because of claimant's misrepresentation of facts and willfully making false statements he has forfeited any rights he may have to workers' compensation benefits." Whereas we might feel differently, we cannot find any manifest error in this ruling as the trial judge appears to be following the statute. Compare Storks v. Manpower Temporary Services, 94-142 (La.App. 5 Cir. 11/29/94), 646 So.2d 1191.
Plaintiff also argues that defendants failed to provide proper notice pursuant to R.S. 23:1208.1 and therefore his rights are not forfeited. However, this situation is not one where an employee fails to truthfully answer an employer's inquiry. This situation involves the willful misrepresentation of plaintiff's medical condition prior to, and during collection of, and after termination of worker compensation benefits. Accordingly, R.S. 23:1208.1 is not applicable to this case.
In his last allegation of error, plaintiff argues that the trial judge erred in failing to find that defendants were arbitrary and capricious in there termination of benefits and in failing to award penalties and attorney fees. Because we see no error in the trial judge's decision which upheld the termination of worker compensation benefits, we find no error in the trial court's conclusions that the defendants were not arbitrary and capricious and that plaintiff is not entitled to an award for penalties and attorney fees.

CONCLUSION
For the above discussed reasons, the decision of the trial court (hearing officer) is affirmed.
AFFIRMED.